Kenneth **MATTHEWS**, t/d/b/a **Golden Triangle Associates, Plaintiff,**

v.

**PHOENIX MUTUAL LIFE INSURANCE COMPANY, a mutual company, Defendant.**

**Civ. A. No. 68–1346.**

United States District Court,
W. D. Pennsylvania.

Sept. 9, 1970.

Krause & Baker, Pittsburgh, Pa., for plaintiff.

Buchanan, Ingersoll, Rodewald, Kyle & Buerger, Pittsburgh, Pa., for defendant.

## OPINION

WEIS, District Judge.

A dispute between a life insurance company and a broker-agent regarding the duration of liability for commissions is the basis of this non-jury proceeding.

In 1965, the Golden Triangle Associates was a partnership composed of Warren James, Leonard Pilarski and plaintiff, Kenneth Matthews. After acquiring a "broker of record" letter [1] from the Smaller Manufacturers Council of Western Pennslyvania, Golden Triangle developed two proposals of group life, accident, health, and hospitalization programs for the various company members of the Council. These plans were not well received and in the spring of

1966 Golden Triangle entered into an arrangement with the defendant, in conjunction with Blue Cross and Blue Shield of Western Pennsylvania, to provide an attractively priced plan of group insurance.

On July 7 and 8, 1966 Warren James, one of the partners, and Dominic Casabona, an employee, of Golden Triangle, met with Dennis Hardcastle, a vice-president, and Jerry Campbell, a district group representative, of the life insurance company, in order to reach an agreement regarding commissions, renewal commissions and other details of the program.

The meetings were spirited and apparently somewhat frustrating to Golden Triangle. It appears that Phoenix Insurance Company, by virtue of a multiple employer trust arrangement which it had had in effect for some years, was able to offer a lower premium than other competitive insurance companies. It, therefore, had no particular need to make any overly generous arrangements with Golden Triangle regarding commissions and renewals. On the other hand, the Smaller Manufacturers Council plan offered the defendant a good opportunity to sell to the some four hundred member companies, a not insignificant number, even to a large insurer. Additionally, the defendant was faced with the fact that Golden Triangle was "broker of record" and according to the business practice of the defendant was entitled to commissions on sales to the group if not due other Phoenix agents or recognized brokers by previous commitments.

After considerable negotiating the parties orally agreed upon a "protection" arrangement providing for a period of enrollment extending from September 1966 to ultimately February 1, 1967, during which period of time it was agreed that the defendant would not give quotations on member firms of the Smaller

1. "To whom it may concern: This is to advise you that we have appointed the Golden Triangle Associates, and/or Kenneth R. Matthews, and/or Leonard J. Pilarski, and/or Warren James, as brokers of record for the Smaller Manufacturers Council's insurance program. This letter shall be binding on the part of the Council until rescinded."

Manufacturers Council to any broker other than Golden Triangle nor would applications on such business be accepted without authorization from Golden Triangle. Further, where data was obtained during the enrollment period by either Golden Triangle or the defendant's representatives, no quotations would be given for one year from the date such data was obtained. Here the parties have no dispute about the arrangement. It is with respect to the commissions in the nature of an override which would be due the partnership after the protection period had expired that the disagreement arises.

Hardcastle, the defendant's vice-president, advised James and Casabona that the insurance company did not operate through a general agency plan and, therefore, it did not grant overrides. A "field service fee" arrangement was suggested and tentatively agreed upon but was later modified by consent of both parties to provide that "If a broker or a Phoenix Mutual agent brings in a member firm outside those circumstances governed by the 'protection' guides above, the broker or agent receives 15%, and Golden Triangle Associates, the remaining 5%, first year commissions and the broker or agent receives 2%, and Golden Triangle Associates the remaining 1%, renewal commissions." *

A letter dated July 8, 1966 was sent by Hardcastle to Golden Triangle confirming the oral agreement; the approval of the Smaller Manufacturers Council was obtained for the underwriting by Phoenix; and in August Golden Triangle and its partners individually were registered with the Insurance Department of Pennsylvania as agents of the defendant.

Sales of policies began in September 1966 and the arrangements between the three parties continued until May 26, 1967 when the Smaller Manufacturers Council terminated its "broker of record" relationship with Golden Triangle. On May 31, 1967 the Court of Common Pleas of Allegheny County, in a suit filed by Warren James against Pilarski and Matthews, entered an Order dissolving the partnership and appointed a Master to wind up the affairs of the partnership. In September of 1968, pursuant to an agreement between the parties, an Order was entered dismissing the action with prejudice and directing the Master to deliver assets of the partnership to Kenneth Matthews, the plaintiff herein. Apparently the consent order was part of the arrangement agreed upon in September 1967 when James and Pilarski assigned their interest to Matthews.

The question which is the heart of the dispute is whether the "override" type of commission arrangement is to continue for so long a period of time as Phoenix continues to write policies for member firms of the Smaller Manufacturers Council as plaintiff contends, or whether the arrangement terminated when Golden Triangle's "broker of record" authority was cancelled by the Smaller Manufacturers Council on May 26, 1967, as defendant maintains.

The trial developed no evidence of an actual agreement between the parties on this important item. It is true that the plaintiffs asked for, and hoped to receive, a concession that "overrides" would continue so long as Phoenix continued to write the member companies of the Smaller Manufacturers Council but it develops that Phoenix felt strongly that its obligation to pay this type of commission to Golden Triangle should not last beyond the period of its authority as "broker of record".

Despite the earnest arguments of both parties, the court is convinced that there was, in fact, no agreement reached between the parties on this particular point. There was no meeting of the minds and, in some aspects, not even an expression of intent. Golden Triangle contends that its side of the bargain was completely performed when the Council agreed to accept Phoenix and the plan was actually inaugurated. The evidence however fails to support this position.

* See Appendix.

For example, the portion of the agreement quoted supra (p. 3) is silent on duration and the plaintiff produced no testimony that any person with, or without, authority agreed on behalf of Phoenix to pay these commissions indefinitely. By the same token, the defendant admits that it never specified that the override commission arrangement would continue only so long as the "broker of record" relationship existed. The defendant apparently relied upon custom within the industry but the court finds the evidence on this phase unconvincing.

■ In the absence of provisions specifying the period for which the split or override commissions are payable, the court concludes that eligibility is measured by the duration of the contract between the principal and its agent.

Because of the peculiarities of Pennsylvania insurance law, while a "broker" is recognized as an agent of the insured in the casualty and fire insurance fields and an "agent" is licensed as a direct representative of the insurer, no such distinction exists in the life insurance business. The Pennsylvania statutes specifically require that no life insurance may be written except by a licensed agent of the insurer. No provision is made for the legal status of a "broker" of life insurance. It is interesting to note that Golden Triangle Associates, even though dissolved, is still listed with the Insurance Department of Pennsylvania as an agent of the Phoenix Insurance Company, as are James, Pilarski, Matthews, and Casabona. These listings were made originally at the instance of the defendant and must be renewed annually by it.

Because of the provisions of the Pennsylvania statutes, therefore, the agreement reached between the parties on July 8, 1966 in effect recognized a dual arrangement. Phoenix acknowledged that Golden Triangle was "broker of record" for the Smaller Manufacturers Council, which, of course, was an arrangement between the Council and Golden Triangle which could be terminated at any time, and over which the defendant had no control. However, a relationship had been created between Golden Triangle and Phoenix, that being principal and agent, and to which the Council was not a party. No time was specified for duration or expiration.

■ Since there was no actual agreement between the parties as to how long this agency between Phoenix and Golden Triangle would continue, the relationship is presumed to be one terminable at will (2 C.J.S. Agency § 68). The evidence revealed that no action has yet been taken by Phoenix to affirmatively terminate the arrangement and it therefore would continue to this time together with the concomitant duty to pay "overrides" were it not for the superseding effect of the partnership dissolution which occurred in May of 1967.

The arrangement between a life insurance company and its agent is one for personal services, consisting primarily of the efforts of the agent to sell the coverages made available by the insurer, to a lesser extent to collect at least the initial premium, and to service complaints or claims of the insured.

■ The general rule is that a principal contracting with a partnership for personal services has a right to expect performance by each and every member of the firm and that the withdrawal by death, dissolution, or otherwise of one or more partners from the entity dissolves the contract between the partnership and the principal (2 C.J.S. Agency § 87b).

While this rule has been relaxed to some extent, see Knudsen v. Torrington Co., 2 Cir., 254 F.2d 283, it seems clear that the defendant relied more upon the efforts of James and Casabona rather than the plaintiff and therefore, even under the more liberal doctrine, Matthews as sole surviving partner carrying on as proprietor of Golden Triangle Associates is not the entity which the insurance company originally designated as its agent.

We find, therefore, that the contract between Phoenix and Golden Triangle Associates was one terminable at will, that no steps had been taken by either party to dissolve the agreement until May 31, 1967 when, by operation of law, the Court Order of dissolution ended the arrangement and the obligation of the defendant to pay "override" commissions for sales occurring after that date.

This opinion embodies the findings of fact and conclusions of law required by Rule 52. For completion of the record, the court has noted "affirmed" on the margins of certain requests for findings of fact and conclusions of law submitted by the parties.

## ORDER OF COURT

And now, to-wit, this 9 day of September, 1970, since the court had ordered that this case be tried on liability first, with damages to be determined later by a Master agreed upon by the parties, the plaintiff and defendant are directed to confer and submit to the court within Fifteen (15) days the names of three persons considered satisfactory for appointment as Master.

CHARTERED 1851

## APPENDIX

**PHOENIX MUTUAL** LIFE INSURANCE COMPANY ONE AMERICAN ROW, HARTFORD, CONNECTICUT 06115

July 8, 1966

Mr. Warren W. James
Executive Vice President
Golden Triangle Associates
Suite 360, Gateway Towers
Pittsburgh, Pennsylvania 15222

Dear Warren:

While, within the next few weeks, you will be receiving much material on the Smaller Manufacturers Council group insurance program, the purpose of this letter is to confirm our conversation as far as commissions and "protection" are concerned with regards to the group life, weekly indemnity and major medical coverages.

"PROTECTION"

A. No quotations will be given by Phoenix Mutual to any other brokers than yourselves on member firms of the SMC during the enrollment period which has been tentatively set from September 1, 1966 to December 31, 1966 - nor will applications on such business be accepted by Phoenix Mutual without your authorization.

The exception to this latter statement would be if a case was sold as the result of a proposal issued prior to the start of the enrollment period - in which case the "field service fee" arrangement as described below would come into play.

B. Similarly, no quotations will be given on member firms, whose data is obtained during the enrollment period by either Golden Triangle Associates or Phoenix Mutual Group representatives, for one year from the date data is obtained, without your authorization.

COMMISSIONS

A. The commission rate on all business on which G.T.A. is the writing agent will be 20% First Year and 3% Renewal. This includes business closed by Phoenix Mutual group representatives during the enrollment period or within one year of the date employee data is obtained during the enrollment period.

**PHOENIX MUTUAL** LIFE INSURANCE COMPANY OF HARTFORD, CONNECTICUT

Mr. Warren W. James July 8, 1966
Executive Vice President
Golden Triangle Associates

 Modified B. If a broker or a Phoenix Mutual agent brings in a
 member firm outside those circumstances governed
 by the "protection" guides above, the broker or
 agent receives 15%, and Golden Triangle Associates,
 the remaining 5%, first year commissions and the
 broker or agent receives 2%, and Golden Triangle
 Associates the remaining 1%, renewal commissions.

C. If a Phoenix Mutual group representative brings in a member firm, outside
 of the "protection" as outlined above, the first year commission to G.T.A.
 would be 10% instead of 20% but the renewals would remain the same.

We will be in touch with you very shortly, but if you have questions on the
substance of this letter, please contact Jerry Campbell immediately.

It was good to meet you and we look forward to many years of mutually profitable
activity.

 Cordially,